There is only really one question in this case, and that obviously is whether under these facts, where appellant was retrieving his own money from a bank, whether that can violate 1014. I think that the government has tried to shift the field a little bit and claim that we're arguing that we've added an element, which is risk of loss, which we certainly haven't. And I looked at our opening brief. We never once made that claim. We certainly didn't in the reply brief. But some of the cases do talk about risk of loss, and risk of loss is probably the most important analysis that the court can do in determining whether or not what happened involved an application or commitment. So you're saying that you're not adding an element, but that there has to be shown a risk of loss? I'm not quite understanding. Right. The statute requires – actually, it may help to go back. When the statute was enacted, it was to protect banks. It was a post-Depression era statute. They wanted to protect banks who were lending money, who were extending credit. And so they said if you make a false statement in connection with a loan and all those things, or a commitment or an application, it violates the statute. But what is a commitment or an application to us now? And it's pretty – it may seem on its face hard to understand what that means. It can't be anything. It can't be if I go into a bank and ask them for a parking spot and I claim I'm a regular customer and I'm not. That can't be an application that violates the statute, even if it's a false statement and I'm applying to the bank for a parking spot. But in this case, in every case cited by the government and in every case cited by the defense, there was the bank committing its money or is in danger of committing its money or breaking a promise it made or a liability. Like the Boren case. The Boren case involved a person saying to the bank, stop payment on that cashier's check. Well, the cashier's check was a promise by the bank to the person who held the check that they were going to make payment. So the person applied to the bank to get the bank to break a commitment. In this case, Mr. Taylor asked the bank for his own money. And the evidence was absolutely clear that the bank didn't want to keep the money. And there are two piles of cash, we'll call them imaginary piles, in the bank. But isn't the cashier's check still a commitment by the bank? It can be, but that's not what Mr. Taylor was not accused of illegally getting a cashier's check. Well, he was, right? He was accused of lying to get a cashier's check. But his money in a cashier's check. So if he'd asked the bank to stop payment on the cashier's check, that would have been an application with regard to a bank's commitment to make that payment. But aren't you really saying that the lie has to be material to a banking transaction? And isn't that what Wells held is not the case? No, I'm not. What I'm saying, it cannot be a commitment or an application unless it puts the bank's money at risk. In every single case cited, every single case before this case. So now you are sounding like you're saying risk of loss is an element. If it puts the bank's money at risk, isn't that saying risk of loss should be an element? And if we did that, we'd be in conflict with the Fourth Circuit? No, a risk of loss guides our analysis in what is an application or a commitment. And that's my point of my hypothetical. If you go into a bank and lie to them and ask them for something, if I say I'm a regular customer, can I have a pencil, I'm applying for a pencil, and they give me a pencil and I walk out of the bank, I don't think anyone's going to say that violates 1014. And 1014 is pretty clear. This has to be, if you look at every single transaction in there, a loan, and the case is a letter of credit, that's clearly putting the bank's money at risk. There was nothing in this that put any of the bank's money at risk. So you are arguing that there needs to be a risk of loss? Yes, but that doesn't make it an element. It can't be a commitment without a risk of loss. And so if you say that a false statement in connection with a loan, we clearly understand a false statement in connection with a loan puts the bank's money at risk. Well, do you think the jury needs to be told that there needs to be a risk of loss when a jury is instructed about what it needs to find to find someone guilty? I mean, it sounds like you're saying they do. Well, the jury needs to be instructed what the elements of the offense are. And if the government is proceeding on, say, a loan, a loan is clearly stated in the statute. If it's saying a letter of credit, probably don't need instruction. But if you're saying that jurors, this is an application we're saying. It's a commitment. And if the jurors want to know and if the lawyers want the jurors to understand what is an application or a commitment, yes, I think they should be told it involves putting the bank's money at risk. But it's not a jury instruction question here. It's was there sufficient evidence. And in this case, it is absolutely clear the bank's money was never at risk. It was Mr. Taylor's money. Okay, so how about applying for a checking account? Is that an application? Well, no, probably not because you're not putting the bank's money at risk. Well, what if you have overdraft protection? Well, it could be. Do we know if he did? That's certainly not in the record. And I think that that would be wholly outside the record and completely guessing. So I think my answer to you might be that it would depend, and I know that's not the answer you want. But, yeah, it would probably depend. But on the record we have here, all we know is that he went to a bank and he wasn't charged with a false statement in opening that bank account, except for one count, count 13. That has to do with the church. But the count, the 1014 counts, had only to do with going in, showing a driver's license that had another person's name on it, and that he had opened the account in that name. And opening the account was not the crime charge. It was getting his money out of the bank. And that can't violate 1014 because there's no risk of loss to the bank. So it's not an application. It's not a loan. It's not a line of credit. And it's certainly not covering a bounce check with the bank's money. The bank's money was never at risk in this case. I think I interrupted you. Did you have a question? No, I'm done. Okay. I'll reserve whatever remaining time I have for rebuttal. Thank you. Good morning. May it please the Court. I'm Greg Knapp of the United States. I have to confess I'm now a little confused as to whether or not the defendant is arguing for a risk of loss element. So why don't I begin by addressing why the transactions that occurred here are commitments. These were cashier's check transactions. And in this court in the United States v. Boren, explicitly recognized that a cashier's check is a bank commitment. Therefore, it follows that the defendant's false statements of his identity, made to influence the issuance of those commitments, are covered by the statute. Now, the defendant focuses on the precise holding of Boren, which was that a stop payment request on a bank check is a commitment. And I acknowledge that that is the narrowest, most precise holding of Boren. But the problem is for the defendant is that you can't reconcile that holding with conclusion other than that a cashier's check is a commitment. And by the way, that's consistent with the general legal understanding of what a cashier's check is. So I agree with you that it's hard to define a rule that would be consistent with Boren and Wells and also have him not be guilty. But isn't it very odd that he's guilty? I mean, how in the world are the facts of this case what this statute is supposed to be about? Well, because the statute speaks in terms of a broad variety of transactions and is designed to protect the banks from false statements. But the bank wasn't injured. No one was injured. I mean, he was prosecuted for tax crimes and he was held guilty of those and that's clearly a problem that occurred here. But in terms of the statements to the bank, the bank wasn't injured. The government wasn't injured. No one lost their money. Why is this a crime? Well, I acknowledge that the bank may not have lost any quantifiable deposit funds. Nonetheless, the bank employees testified that they had a general interest in knowing their customer in order to ensure that they were held guilty. And is that what this statute is about, so that people can say hello to the right person? In part, I believe it is. Because the statute is not limited to transactions that might expose the bank to a risk of deposit funds or the rights of its own funds. It speaks in terms of false statements. And by the way, the statute is not confined to banking or lending institutions. It covers a wide variety of institutions. And the bank employees indicated that that interest was circumvented in this case because they want to make sure that their accounts aren't being used to facilitate criminal activity, which, in fact, it was in the case. And so that's a legitimate interest in and of itself. Moreover, we have the bank employees testifying about the administrative and the legal expense that they incurred in order to track down the defendant's fraud. For example, Wells Fargo investigator Terry Johnson testified about the steps that he took to trace all of the transactions between these fraudulent accounts at Wells Fargo and to ultimately identify the defendant, Lloyd Taylor. We have the testimony of Wells Fargo attorney... What triggered that? Why did they need to do that? That was in response to the defendant's request for a cashier's check on an account that he held in the name of James Holloway. That was what initially triggered the investigation. But, I mean, was it triggered because the government alerted the bank to the fact that he was using false identities? He'd been transacting business in these other names for a long time, so why all of a sudden did they start investigating that one? Because in connection with that request for a cashier's check, the bank manager at the appropriate branch realized that there was a lack of supporting documentation for this account that he held jointly in the names of James Holloway in a church, Mount Windsor Church. And so that was when the investigation began. And that was when that bank branch manager contacted Wells Fargo investigator Terry Johnson. He began to track down all of these identities. So given that investigative history... So the bank figured this out before the government. I actually didn't realize that. Is that what you're saying? Yes, correct. That's true. And then the bank fraud investigator, Wells Fargo fraud investigator Terry Johnson, contacted law enforcement. Paul Abasi, who was the lead investigator in this case, who justified a trial. So in light of that investigative history, I think it's important to push back on any suggestion that the government here was just looking for some excuse to tack on aggravated identity theft accounts and look for some predicate offense. In fact, the banks, by their own actions, indicated their interest in the defendant's... But banks are very concerned about identity theft. Of course they are, because they want to make sure that these accounts aren't used for money laundering or, in this case, tax evasion, as in fact they were. So even if there were some risk of loss requirement for the statute, which there isn't, but if there were, I submit that this type of legal and administrative expense that the banks incurred in order to track down the fraudulent identities would satisfy that requirement. And I would note that in the context of bank fraud, Section 1344, this court has held that even assuming that that statute required a risk of loss, that type of administrative expense on the part of the banks would be sufficient to satisfy it. But in any case, the merits of the defendant's argument for a loss requirement, whether he's describing it as an element or otherwise, is lacking any legal support. But you do agree that the false statements have to be made in connection with doing banking business and not to get a pencil or a parking lot. Correct. The statute is further limited by the enumerated list of transactions. Now in his reply brief, returning to the issue of whether this is a commitment, the defendant suggests that the commitment has to be existing in order for the false statements to be charged to that transaction. But there's no basis in the statutory text for such a requirement. And imposing such a requirement wouldn't make any sense, because it makes no sense to limit the reach of a false statement statute to a period of time after the defendant has already made the false statements and he already has what he wants. In this case, he already has the cashier's checks and is walking out of the bank. I would also note that the Tenth Circuit Stoddart case of 1978, which is one of the cases that the defendant relies on, it expressly rejects the notion that the commitment has to be existing at the time of the transaction. The defendant also in his briefs, and I believe here today, has placed a lot of emphasis on simply withdrawing his own money. He tries to draw a distinction between getting cashier's checks on the one hand and making money withdrawals on the other hand. But that is not what was charged and that is not what was proven in this case. The defendant was not charged with simply withdrawing money from his bank accounts. He was charged with obtaining cashier's checks through the use of his fraudulent identities. I think we understand. Then I'll just ask, if the court has any further questions, I'll be glad to address them. Otherwise, we will ask the court. I don't think we have any other questions. We'll ask the court to affirm. Thank you. Thank you. Your Honors, I think the government's argument shows how far they're trying to push this statute and stretch it. It's a very simple Depression-era statute. They talk about facilitating criminal activity. This is a place where he kept his money under false names, true, but it's where he kept his money and no one else's money. He wasn't running a Ponzi scheme out of this. Although the government may have an interest of keeping track of where money is and understanding that, that's not what this statute protects. In fact, the government's citation of Stoddard is very interesting because, I'm going to quote from Stoddard here, the purpose of Section 1014 was to cover all undertakings which might subject the FDIC insured bank to risk of loss. And that's what almost every case, there may not be an element, but if you look at the facts of every one of these cases, there is a risk to the bank before they will impose 1014 liability. And there was zero risk in this case because it was, just to finish up hypothetical, I started a very simple explanation. There's two stacks of money in the bank. One stack belongs to the bank. The other stack belongs to whoever put it in there. And this came out through the testimony of the witness. If you are reaching into or asking the bank to do something or put at risk the bank stack, you have violated 1014. If it's your own money, you have not. And the Horde cases and other cases make that point pretty explicitly about what does and does not violate 1014. For instance, in Horde they notice a depositor ordinarily stands in the position of a creditor of the bank rather than the other way around. And they agree with Horde's work. Horde argued that crediting his own account would not be instituting or inducing it to make an advance loan or commitment. Is this case you're talking about in your brief? Yes. What is the name of it? Horde, H-O-R-D. It's 6F 3rd 276, 5th Circuit, 1993. It's also in the government brief. Or if it's not in my brief. I don't think it's in your brief. It's in the government brief. And the Horde case made absolutely clear that some act that undeniably influenced the action of the banks are nevertheless not criminalized by 1014, and they talk about deposits. I think under Horde, under Stoddard, under every case cited by the government, there has to be some risk to the bank. There was none here. Thank you. Thank you.
judges: Schroeder, Friedland, Chhabria